UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARRIE HAWES,

          Plaintiff,                       Civil Action No. 12 cv 12035

     v.                               District Judge Thomas L. Ludington
                                        Magistrate Judge Laurie J. Michelson

MICHAEL J. ASTRUE
COMMISSIONER OF
SOCIAL SECURITY,

          Defendant.
_____/

**REPORT AND RECOMMENDATION TO
DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [8]AND
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [9]**

Plaintiff Carrie Hawes appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 2) are the parties' cross-motions for summary judgment (Dkts. 8 & 9). For the reasons set forth below, the Court finds that substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 9) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## I. BACKGROUND

Plaintiff was 34 years old when she claimed that she could no longer work. (Tr. 113.) Plaintiff graduated from high school and attended one year of college, but received special education services at least until she was 16 years old. (Tr. 150, 161, 255.) Before she allegedly became disabled, Plaintiff worked as a cashier, a secretary, and a direct care worker. (Tr. 146, 153-61.)

Plaintiff alleges that she stopped working because, "I just prefer not to because of my problems." (Tr. 145.) She alleges disability based on a learning disability, high blood pressure, asthma, carpel tunnel syndrome, migraine headaches, mood swings, and numb legs, arms, and hands. (Tr. 145.) As a result of these conditions Plaintiff reports,

> numb hands keep me from lifting - my back gives out on me due to lower back problems - most days I can't keep from being irritable and I argue with the people I really want to yell at the people and I know I can't. I read numbers backwards which make[s] me so frustrated that I act out.

(*Id*.)

### A. Procedural History

On September 16, 2008, Plaintiff applied for disability insurance benefits asserting that she became unable to work on May 1, 2007. (Tr. 65, 113.) The Commissioner initially denied Plaintiff's disability application on February 24, 2009. (Tr. 65.) Plaintiff then requested an administrative hearing, and on June 22, 2010, she appeared with counsel before Administrative Law Judge Elliot Bunce who considered her case *de novo*. (Tr. 48.) In an October 26, 2010 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 19-31.) The ALJ's decision became the final decision of the Commissioner on March 15, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on May 7, 2012. (Dkt. 1, Compl.)

**B.  Medical Evidence**

The Commissioner determined, based on Plaintiff's earnings record, that she was insured through December 1, 2008. (Tr. 22.) Plaintiff must therefore establish that she was disabled between May 1, 2007, the alleged onset date, and December 1, 2008, the date last insured.

### 1. Evidence of Mental Impairments During the Relevant Period

On March 11, 1991, psychologist Mary Kayler determined Plaintiff's full scale IQ as being 79. (Tr. 254.)

Seven and one-half years later, on October 9, 1998, psychologist Thomas Seibert evaluated Plaintiff's intellectual capacity.  (Tr. 276.)  At this time,  Plaintiff tested "in the borderline range of intellectual ability" on a Wechsler Adult Intelligence Scale-III test. (Tr. 261.) Mr. Seibert concluded that Plaintiff possessed a mixed learning disability in reading and spelling of "severe proportions," and noted that she would have "difficulty reading want ads, completing job applications, taking employer administered aptitude tests, understanding complex written or verbal instructions, and working in any occupation that requires above average aptitude in mathematics." (Tr. 271.) Mr. Seibert also concluded that Plaintiff should be considered "a low average candidate to learn a skilled trade." (*Id*.)

On February 24, 2009, Dr. Rom Kriauciunas completed a psychiatric review technique and reviewed Plaintiff's records for the period  May 1, 2007 to December 31, 2008.  Dr. Kriauciunas concluded there was "insufficient evidence" of disability. (Tr. 233.)

### 2. Evidence of Physical Impairments During the Relevant Period

Plaintiff made several visits (e.g., June 6, 2007, June 15, 2007, December 31, 2007, February 13, 2008, and June 10, 2008) to gynecologist Dr. Joseph A. Kingsbury, during which Plaintiff

complained of chronic pelvic pain with significant urinary frequency, urgency, and nocturia. (Tr. 211, 209, 205, 202, 215.) It appears that Dr. Kingsbury was ultimately unable to identify the cause of Plaintiff's symptoms despite a prolonged investigation. (*See* Tr. 211, 209, 205, 202, 215.)

On June 7, 2007, Dr. Bhargavi Raiji performed an ultrasound which was also inconclusive as to the source of Plaintiff's pain. (Tr. 224.) On November 2, 2007, Dr. William Melton performed CT scans of Plaintiff's abdomen to investigate the source of her pelvic pain. (Tr. 221.) The tests revealed fatty infiltration of Plaintiff's liver as well as a "marked loss of cortex" in her right kidney, but failed to disclose the source of her pelvic pain. (*Id.*) As part of the investigation of Plaintiff's ongoing pelvic pain, marked with complaints of intermittent diarrhea and constipation, as well as occasional rectal bleeding, Dr. Justin Miller performed a colonoscopy on Plaintiff on February 5, 2008. This procedure yielded a diagnosis of mild internal hemorrhoids, but again failed to identify the source of her pain. (Tr. 180, 225.) Dr. Miller noted that Plaintiff's procedure was "normal," but he recommended an increase of fiber in her diet to 25-30 grams per day. (Tr. 181, 226.) On February 23, 2008, Dr. Kingsbury performed a laporoscopy, resulting in a diagnosis of chronic pelvic pain plus omental adhesive disease. (Tr. 182, 218.) He removed the adhesion but was still unable to identify the source of Plaintiff's pain. (Tr. 183, 219.)

Plaintiff visited her primary care physician, Dr. Kevin Snyder, on October 26, 2007, complaining of headaches resulting from certain movements, as well as longer duration migraine-type headaches. (Tr. 294.) She also mentioned abdominal pain and reflux (*Id.*) Dr. Snyder diagnosed her with probable migraine, stress vascular headache, GERD, possible lower abdominal hernia, hypertension, and depression. (Tr. 293.) He continued medications, which included Zoloft, HCTZ, Pepcid AC, Motrin, a high blood pressure medication, and a migraine medication, and added

AcipHex, Topamax, and Fioricet. (*Id.*) At a February 8, 2008 visit to Dr. Snyder, Plaintiff complained of heartburn and that her medication was not relieving her pain. (Tr. 290.) Dr. Snyder conducted an electrocardiogram which was negative. (*Id.*) He switched her medication to Prevacid and recommended a stress test and ultrasound. (*Id.*) At a March 3, 2008 visit, Dr. Snyder reported a negative stress test. (Tr. 289.)

On May 28, 2008, Plaintiff was examined by cardiologist Dr. James Chambers. (Tr. 184.) She was experiencing substernal discomfort and was diagnosed with costochondral chest pain secondary to carrying her child. (*Id.*) Dr. Chambers did not believe that she was having anginal symptoms. (*Id.*) Dr. Chambers also diagnosed nicotine addiction, reflux esophagitis, obesity, and recommended that Plaintiff cease smoking, use a weight reduction program, perform 30 minutes or more of aerobic exercise daily, and take a non-steroidal anti-inflammatory. (*Id.*)

At a June 23, 2008 appointment Plaintiff complained of breathing troubles. (Tr. 288) Dr. Snyder diagnosed probable asthma and prescribed a Proventil HFA inhaler. (*Id.*)  Reporting constipation and continued breathing difficulties Plaintiff again saw Dr. Snyder on August 29, 2008. (Tr. 288.) He diagnosed constipation for which he prescribed Amitiza and asthma for which he prescribed Asthmanex. (*Id.*)  On September 18, 2008, Plaintiff visited Dr. Pradeep Ramachandaran of Michigan Lung Specialists with complaints of difficulty breathing, particularly during exertion, as well as bouts of daytime sleepiness. (Tr.189.) A spirometry breathing test, performed during that visit, revealed normal results. (Tr. 189, 192.) Dr. Ramachandaran diagnosed asthma, not otherwise specified, and dyspnea, not otherwise specified, "likely multifactorial" with asthma, gastroesophageal reflux disease ("GERD"), and obesity. (Tr. 191.) He prescribed an inhaled steroid and a long acting bronchodialator. (*Id.*) With respect to her obesity he recommended a thyroid

stimulating hormone and a complete blood test. (*Id.*) He also diagnosed hypersomnia, not otherwise specified, and recommended polysomnography. (*Id.*)

On November 18, 2008, Plaintiff returned to Dr. Snyder with complaints of stomach pain, heartburn, constipation with tenderness, and weight gain. (Tr. 287.) She also wanted to discontinue Zoloft because she felt it was not helping her. (*Id.*) Dr. Snyder diagnosed abdominal pain secondary to GERD, irritable bowel syndrome with constipation, and obesity. (*Id.*) He switched Plaintiff's depression medicine to Effexor and discussed her diet. (*Id.*)

### 3.  *Evidence Outside the Relevant Time Period*

On December 28, 2008, Plaintiff saw Dr. Snyder "for problems with her mood." (Tr. 286.) She asked for "something to take the edge off" and said she stopped taking Effexor because it "gave her problems, which she didn't like." (*Id.*) During this visit she also complained of constipation which was causing lower back and abdominal pain. (*Id.*) Dr. Snyder recommended that she continue her Prevacid and try Cymbalta. He noted that she was not taking her Prevacid regularly and that she "stopped her Topamax and pretty much a lot of her medications as she feels she knows better what to take." (*Id.*)

On January 12, 2010, Plaintiff was referred to Dr. Brad Murphy to investigate possible interstitial cystitis. (Tr. 259.)

A June 7, 2010 medical source statement (mental), completed by licensed social worker Cheri Dickenson, indicated major depression and that Plaintiff was "moderately" limited in her ability to maintain concentration and attention, but was not significantly limited in her ability to complete simple one or two-step job instructions. (Tr. 274.) Ms. Dickenson also concluded that

Plaintiff had a "marked" inability to interact with supervisors and co-workers, while her ability to interact with the public was only "moderately" limited. (*Id.*)

In a June 21, 2010 medical source statement (mental), Dr. Snyder indicated that Plaintiff was "mildly" limited in her ability regarding simple one or two-step job instructions and "mildly" limited in her ability to maintain concentration and attention. (Tr. 277.) He also indicated that Plaintiff was "mildly" limited in her ability to interact with both employers and the public. (*Id.*)

At a January 19, 2009 office visit, Dr. Snyder noted essential hypertension, GERD, depression, possibly bipolar, and irritable bowel syndrome, constipation predominant. (Tr. 285.) Plaintiff reported that the Cymbalta was helping. Dr. Snyder recommended that she continue her medications and take two scoops of MiraLax per day. (*Id.*) At her remaining visits to Dr. Snyder, on February 11, 2009 and May 15, 2009, Plaintiff requested that her depression medicine be switched to Prozac, after "[s]he took her cousin's and she felt better." (Tr. 284.) Dr. Snyder noted "she knows this is not a good practice." (*Id.*) He switched her to Prozac, "since it has helped out." (*Id.*)

On June 14, 2010, Dr. Henry Hagenstein performed a nerve conduction study on Plaintiff. (Tr. 282.) Dr. Hagenstein revealed findings "compatible with moderate carpal tunnel syndrome bilaterally." (*Id.*) Dr. Snyder completed a medical statement (physical) on June 21, 2010, indicating carpal tunnel resulting in a reduced ability to lift less than 10 pounds and moderate and severe limitations in Plaintiff's push/pull ability in her upper extremities. (Tr. 279.) Dr. Snyder further indicated that Plaintiff's ability to sit or stand during an eight hour day was limited to "about 6 hours." (*Id.*)

### C. Testimony at the Hearing Before the ALJ

#### 1. *Plaintiff's Testimony*

At her June 22, 2010 hearing before ALJ Bunce, Plaintiff testified that the last time she worked "was about five years ago." (Tr. 53.)  Plaintiff further testified that she could "do some vacuuming, some dishes, laundry. I take care of -- and I help my daughter." (*Id.*) Plaintiff also testified that she is independent at home as her husband, "leaves the house at 4:30 and he don't get home until like 5:30." (*Id.*)

Plaintiff affirmed that she experienced pain, and testified that she got "pressure headaches really bad and my hands and I get like numbness up through my legs and stuff." (Tr. 54.) She reported getting headaches "every time I bend to go reach something" but that "most of the time" they clear when she straightens up. (*Id.*) She also reported experiencing chest and abdominal pain "a couple of times a day," while the hand pain was, in her words, "all the time when [she] use[d] them." (*Id.*)

Plaintiff reported taking medication for depression and high blood pressure.  (Tr. 54-55.)

Plaintiff also testified to concentration and memory problems:

> I have a hard time concentrating on something. If something else is going on, I'll pay attention to what they're doing and I'll be going against something -- I forget what I go back to get and I'll remember it and I'll go back to go do it and I'll forget again.

(Tr. 57.)

Plaintiff reported that she could lift or carry 15 or 20 pounds throughout the work day.  (Tr. 57.) She also testified that her "legs feel like they're giving out on me all the time." (Tr. 58.) Although Plaintiff reported some dizziness after standing for long periods of time, she testified that she could stand for 15 minutes before she would need a break and could sit for about 30 or 40

minutes before needing to move.  (*Id.*)

Plaintiff reported feeling as though some days she just didn't "want to see the world." (Tr. 59.) When asked why her desire was to avoid the public, she testified to feeling as though "everybody's talking about me, everybody's looking at me . . . staring at me. And sometimes I think that someone's out to get me." (Tr. 59-60.)

### 2. *The Vocational Expert's Testimony*

The ALJ solicited testimony from a vocational expert ("VE") to determine whether jobs would be available for someone with functional limitations approximating Plaintiff's.  The ALJ asked about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who was capable of:

> work at the light exertional level, but does not expose the worker to poor ventilation or extremes of dust, humidity or temperature, that consists of no more than simple, routine, repetitious tasks with one or two-step instructions that does not impose what I would call strict production quotas. I'll define that as meaning the requirement to produce a specified number of units of work in a specified period of time and that requires no more than occasional contact with the public, coworkers and supervisor.

(Tr. 61.)

The VE testified that there would be a number of jobs a person of such capabilities could perform: janitor, dishwasher, and general office clerk. (Tr. 62.)

The ALJ than asked about job availability for an individual with the same characteristics except that the "individual's exertional maximum is at the sedentary level." (Tr. 62.) The VE replied that there would be one job, general office work, 2,300 jobs in the region, and 98,000 nationally. (*Id.*)  The VE testified that the identified work would be precluded "if a person were off task outside allowable breaks and lunch periods on a regular and unpredictable basis[.]" (Tr. 63.) The VE also

testified that the work would be precluded "if someone's concentration were impaired or deficient such that approximately 20 percent of the time or one day a week they were nonproductive[.]" (*Id.*)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act (the "Act"), disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520,

416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

At step one, ALJ Bunce found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of May 1, 2007. (Tr. 24.) At step two, he found that Plaintiff had the following severe impairments: asthma, obesity, gastroesophageal reflux disease (GERD), and a learning disability in reading and spelling. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 25.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to:

> perform work that does not require: exertion above the light level; or exposure to poor ventilation or extremes of dust, humidity, or temperature; or more than simple, routine, repetitive tasks, with one-or-two step instructions.

(Tr. 26. ) At step four, the ALJ relied on vocational expert testimony to find that Plaintiff was unable to perform any past relevant work. (Tr. 29.) At step five, the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 30.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 31.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

12

## IV. ANALYSIS

### A. The RFC Findings

Plaintiff argues that substantial evidence does not support the ALJ's RFC findings with respect to her mental limitations.  (Pl. Mot. Summ. J. at 7-15.)  Specifically, Plaintiff argues that limiting her to "simple, routine, repetitious tasks with one or two-step instructions" does not adequately account for her limitations of concentration, persistence or pace in the RFC.  (*Id*. at  9.)  For the reasons that follow, the Court concludes that substantial evidence supports the ALJ's mental accommodations, which the ALJ correctly identified as a learning disability in reading and spelling.  (Tr. 28, 271.)

In October 1998, psychologist Thomas Seibert evaluated Plaintiff and determined that Plaintiff's learning disability was not "disabling." (Tr. 260-73, 271, 273.)  Plaintiff claims, however, that the ALJ gave insufficient weight to Seibert's findings.  (Pl.'s Mot. Summ. J. at 13-14.)  Mr. Seibert believed that Plaintiff

> would have difficulty reading want ads, completing job applications, taking employer-administered written aptitudes tests, understanding complex written or verbal instructions, expressing complex ideas in speech or writing, and working in any occupation that requires above average aptitude for mathematics.

(Tr. 28, 271.)  It is for this reason that the ALJ restricted Plaintiff to a subset of unskilled simple work.  As the ALJ explained, "The RFC adopted here fully accommodates the limitations specified by Mr. Seibert by restricting the claimant to no more than simple, routine, repetitious tasks, with one- or two-step instructions."  (Tr. 28.)  Plaintiff's argument seems to overlook this key statement.  Indeed, while Mr. Seibert concluded that Plaintiff was a low average candidate to learn a *skilled* trade, he also concluded that "no physical problem will encumber [Plaintiff's] ability to complete

job tasks." (Tr. 28, 267, 271.)  The plain text of the ALJ's decision rebuts Plaintiff's argument that the ALJ disregarded Mr. Seibert's findings and conclusions.  In fact, the RFC imposed greater restrictions (simple, routine, and repetitive tasks comprised of no more than one or two-step instructions) than those Mr. Seibert suggested (a *skilled* trade).  (Tr. 28, 271.)

Plaintiff also contends that she is  mentally retarded and the RFC accommodations did not go far enough.  (Pl.'s Mot. Summ. J. at 8.) But Plaintiff does not direct the Court to any evidence of mental retardation to support her claim.  Moreover, Plaintiff's claim is inconsistent with her education and work history.  Plaintiff testified that despite her learning disability she graduated from high school and attended some college. (Tr. 52.)  She also testified that she cared for her three-and-a-half year old daughter when her husband was at work full-time.  (Tr. 52-53.)  Plaintiff  was able to pay the bills, count change, and maintain a savings account and checkbook. (Tr. 165.)  Plaintiff also reported that she was able to follow oral and written instructions.  (Tr. 167.)  While Plaintiff identified problems with getting bored and a short attention span, the ALJ accommodated for this by limiting her to simple work that required no more than one or two-step instructions.

Plaintiff also claims that the ALJ erred by not accommodating her physical limitations in the RFC.  (Pl.'s Mot. Summ. J. at 9.)  However, Plaintiff merely lists her medical conditions without citing specific evidence in the record that the ALJ overlooked.  This is insufficient to state a claim of error. The court is "not obligated to consider unsupported arguments inadequately developed in their briefs." *Lewless v. Sec'y of Health & Hum. Servs.*, 25 F.3d 1049, 1994 WL 201887, at *4 (6th Cir. 1994); *see also Baldwin v. Astrue*, No. 08-395, 2009 WL 4571850, at *3 (E.D. Ky. Dec. 1, 2009) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.")

### B. The Credibility Analysis

Plaintiff's credibility argument is also not fully developed and, as noted above, Plaintiff runs the risk of forfeiting this argument. *See Lewless*, 1994 WL 201887, at *4; *Baldwin*, 2009 WL 4571850, at *3. The Court has nevertheless considered it and finds that substantial evidence supports the ALJ's decision.

A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ, however, must not reject a claimant's "statements about the intensity and persistence of [his] pain or other symptoms or about the effect [his] symptoms have on [his] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. Instead, the regulations provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186

15

at *2.

Here the ALJ generally concluded that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. 27.) ALJ Bunce then provided a more detailed explanation of why he discounted Plaintiff's credibility.

ALJ Bunce concluded that the medical evidence did not support a finding that Plaintiff was precluded from performing a limited range of light work. (Tr. 27.) Plaintiff complained of chest pain but examinations revealed no indication of debilitating pain (October 2007 (regular heart rate and clear lungs), February 2008 (negative ecocardiogram), March 2008 (negative stress test), and May 2008 (clear lungs and good breath sounds) (Tr. 293, 290, 289, 185.)). Similarly, Plaintiff complained of difficulty breathing, but September 2008 pulmonary testing resulted in normal spirometry as well as reported improvement from the use of Proair. (Tr. 192, 189.) The ALJ concluded that while "claimant has limitations associated with asthma, obesity, and GERD," she is not, as "her relatively unremarkable treatment records" indicate, unable to perform the work as specified in the RFC. (Tr. 28.)

Likewise, while the ALJ acknowledged plaintiff has a learning disability in reading and spelling, he did not find evidence that showed she could not work because of it. (Tr. 28.) As mentioned, the ALJ relied on Mr. Seibert's conclusions and finding no records to demonstrate "more than moderate limitations in any functional area," he "fully accomodate[d] these limitations by limiting the claimant to work that involves no more than simple, routine, repetitive tasks, with one- or two-step instructions" with no production quota. (Tr. 28.)

The ALJ also discounted Plaintiff's credibility based on the incompatibility of her daily

16

activities and her testimony. Again, Plaintiff testified that she graduated from high school and attended some college, spent a large part of her day caring for her three and-a-half year old daughter, and could pay bills, count change, and maintain a savings account and check book. (Tr. 53, 165, 167.) Importantly, Plaintiff also acknowledged that she could follow oral and written instructions. (Tr. 167.) An ALJ can properly consider this evidence and determine whether such activities are consistent with a claim of disability. 20 C.F.R. § 404.1529(c)(3)(i); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001).

Plaintiff's argument essentially asks the Court to re-weigh the evidence; however, this Court's scope of review is limited, and the Court will not disturb the ALJ's credibility determination absent a compelling reason. *Sims v. Comm'r of Soc. Sec*, 406 F. App'x 977, 981 (6th Cir. 2011). The Court finds no such compelling reason here.

### C.  The Hypothetical Question

Plaintiff also argues that the hypothetical question posed to the VE did not address her moderate limitations in concentration, persistence, or pace ("CPP"). (Pl.'s Mot. Summ. J. at 9; Tr. 26.) ALJ Bunce concluded that based on her hearing testimony, Plaintiff had moderate "difficulty" with respect to CPP but noted "that there is very little evidence of record to show even a *mild limitation* in this functional area." (Tr. 26) (emphasis added).

Notwithstanding, the ALJ asked the VE whether there were any unskilled, entry level jobs for someone who was able to:

> perform work at the light exertional level . . . that consists of no more than simple routine, repetitive tasks with one or two-step instructions that does not impose what I would call strict production quotas. I'll define that as meaning the requirement to produce a specified number of units of work in a specified period of time and that requires no more than occasional contact with the public, coworkers and supervisor.

17

(Tr. 60.)  Assuming the ALJ concluded that Plaintiff had moderate limitations in CPP, Plaintiff's argument is that "simple, routine, repetitive tasks, with one- or two-step instructions" is insufficient to address her moderate deficiencies.  (Pl.'s Mot. Summ. J. at 9.)

This Court has previously made clear that the ultimate question is whether substantial evidence supports the ALJ's choice of limitations in the residual functional capacity assessment and corresponding hypothetical, and "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration." *Taylor v. Comm'r of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) (Michelson, M.J.), *report and recommendation adopted*, 2011 WL 2682892 (E.D. Mich. July 11, 2011) (Edmunds, J.); *see also Smith v. Halter*, 307 F.3d 377, 378-79 (6th Cir. 2001) (holding, where ALJ made a finding that the plaintiff "often" has difficulties in CPP, that the ALJ did not need to include talismanic language in his hypothetical, at least where the evidence demonstrated that the claimant's concentrational difficulties were negligible and ALJ limited the claimant to "routine and low stress" jobs that did not involve "high quotas").

This Court discussed the relevant case law at length in a recent report and recommendation, *White v. Comm'r of Soc. Sec.*, No. 12-12833, slip report and recommendation (E.D. Mich. Apr. 26, 2013) (Michelson, M.J.).[1]  In sum, some cases suggest that an RFC limiting a claimant to "unskilled" or "simple, routine" work is not sufficient to account for "moderate" limitations in CPP because the claimant may have difficulty staying on task or keeping pace even when performing unskilled or simple, routine work, but other decisions have recognized that limiting a claimant to unskilled or simple, routine work is sufficient because at least some claimants with those limitations can stay on task and keep pace when the work is simple—often, in those cases, the medical

---

[1] Objections to this Court's report and recommendation in *White* are pending.

evaluation that assessed moderate CPP limitations also concluded that the claimant could perform unskilled work on a sustained basis.

In this case, however, the ALJ did not simply limit Plaintiff to unskilled work but also specified that there must be no production quota, "the requirement to produce a specified number of units of work in a specified period of time." (Tr. 61.) In other words, the ALJ did not exclude a moderate limitation in concentration. *See Burgett v. Comm'r of Soc. Sec.*, No. 12-11361, 2013 U.S. Dist. LEXIS 75285, at * (E.D. Mich. Apr. 29, 2013) ("The position that 'simple and repetitive' or synonymous terms are always insufficient to address moderate CPP deficiencies (even where the record does not support more stringent limitations) reflects an erroneous reading of [*Ealy v. Commissioner*, 594 F.3d 504 (6th Cir. 2010)]. In this case, the hypothetical question adequately accounted for Plaintiff's deficiencies in CPP by precluding fast-paced, quota or assembly line work."), *adopted by* 2013 U.S. Dist. LEXIS 74422 (E.D. Mich. May 28, 2013).  By including the quota condition in his hypothetical, the ALJ included a limitation that enabled the VE to consider jobs Plaintiff could perform and complete even if she spent some time off-task.

The VE testified that if the hypothetical individual's concentration were impaired 20 percent of the time or one day a week, such a person would be precluded from work. However, the ALJ found that the "record does not support these limitations" (Tr. 30, 63) and, as discussed, this finding is supported by substantial evidence. The VE also testified that work would be precluded if the hypothetical individual was off-task beyond the required breaks on a regular and unpredicted basis; however, the ALJ found that the "record does not support these limitations" either.  (Tr. 30, 63.) Plaintiff presents no evidence to counter these conclusions.

Moreover, the ALJ's finding of moderate deficiencies in CPP, if in fact that was the finding, was accompanied by his conclusion that Plaintiff possessed concentrational skills discussed in Parts

19

IVA & B above that support the RFC and reasons for discounting Plaintiff's credibility.

For all of these reasons the Court finds no error.

## V.  CONCLUSION AND RECOMMENDATION

Accordingly, this Court concludes that substantial evidence supports the ALJ's decision. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 8) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. 9) be GRANTED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be AFFIRMED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).

S/Laurie J. Michelson
Laurie J. Michelson
Dated: July 9, 2013                    United States Magistrate Judge

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that the foregoing document was served upon the parties and/or counsel of record via the Court's ECF System and/or U. S. Mail on July 9, 2013.

<div style="margin-left: 40%;">

<u>s/Jane Johnson</u>
Case Manager to
Magistrate Judge Laurie J. Michelson

</div>